UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MIKE CVETKO, | : | |
| Plaintiff | : | NO.: 1:09-CV-01260 |
| | : | |
| v. | : | (JUDGE CONNER) |
| | : | (MAGISTRATE JUDGE PRINCE) |
| DERRY TOWNSHIP POLICE | : | |
| DEPARTMENT, BRIAN K. GRUBB, | : | |
| MICHAEL HENRY, TODD HARRER, | : | |
| and PATRICK RUDISIL, | : | |
| Defendants | : | |
| | : | |

# REPORT AND RECOMMENDATION

Pursuant to an Order entered on August 25, 2010 (Doc. 62), Honorable
Christopher Conner referred defendants' pending motion for summary judgment (Doc.
58) to the undersigned Magistrate Judge.

## I. Background

Before the court is the motion for summary judgment filed collectively by Derry
Township Police Department and officers Brian K. Grubb, Michael Henry, Todd Harrer,
and Patrick Rudisil (collectively, "defendants"). Defendants seek dismissal of all claims
against them, which plaintiffs make under the First and Fourteenth Amendments, 42
U.S.C. § 1985(3), and the Pennsylvania Constitution.

### (A) Facts of the case

The facts as stated here are drawn from the submissions of the parties, and are not
in dispute unless otherwise stated. In April 2007, Plaintiff Mike Cvetko began a series of
protests against the Hershey Company. (Doc. 59, ¶ 1.) His protests consisted of "standing,

sitting, and walking on the median at the 1400 block of West [Hershey Park] Drive" in Derry Township, Pennsylvania, on Saturday mornings. (*Id.*) From April 14, 2007, until June 23, 2007, Cvetko carried out these protests without warnings or citations from the Derry Township police. (*Id.* ¶ 2.) During this time, Cvetko conducted his protests from the side of the road, not the median; he stayed next to his vehicle and faced oncoming traffic. (*Id.* ¶ 6.)

The first time that Cvetko stood on the median was Saturday, June 23, 2007. (*Id.* ¶ 9.) He parked his car on the side of the road and protested the Hershey Company from the median of the 1400 block of West Hershey Park Drive. (*Id.*) When a Derry Township police officer told him to get off the median, he did. (*Id.*) Cvetko returned to the side of the road and continued his protest until the early afternoon. (*Id.* ¶¶ 10–11.) He did not return to the median that day. (*Id.* ¶ 11.)

The following Saturday, June 30, Cvetko recommenced his protest, again going out to the median. Since he had seen Penn State students standing in a nearby triangular median area, he thought he would "try it again and make sure and see what would happen." (*Id.* ¶ 12; Doc. 64, ¶ 12; Pl.'s Dep (Doc. 49-2) at 48:7–49:3, April 1, 2010.) Cvetko testified that the Penn State students told him that a Derry Township police officer had instructed them to remain only on the median while they were soliciting funds from traffic. (Doc. 64, ¶ 12; Doc. 49-2, at 188:24–189:23). "If they can do it, so can I," he thought. (Doc. 49-2, at 50:10–21.)

On July 2, two days later, Cvetko was protesting again on the 1400 block of West Hershey Park Drive. (Doc. 59, ¶ 14.) He was, again, on the median. (*Id.*) Defendant Officer Henry stopped at the scene, parked his car behind Cvetko's on the side of the road, and crossed the street to the median, where he told Cvetko that he was not allowed there. (Doc. 49-2, at 65:7–66:16.) After obtaining Cvetko's driver's license, Henry returned to his vehicle; shortly afterward, defendant Sergeant Grubb arrived and stopped

his vehicle in the left turn lane near Cvetko. (Doc. 64, ¶ 16.) Grubb told Cvetko that he could protest from the side of the road, and could "stay there all [he] want[ed]," but that if he was out on the median again on Saturday, he would be arrested. (Doc. 16, ¶ 22(b); Doc. 29, ¶ 22(b); Doc. 49-2, at 84:19–85:6.) Neither Grubb nor Henry told Cvetko that he was not allowed to protest as all. (Doc. 59, ¶ 23.) Cvetko thought to himself, "[F]ine, we got a deal here. If I choose to be arrested, I go. If I don't, I don't. Simple." (Doc. 49-2, at 69:11–14.) Officer Henry issued Cvetko two citations: one for walking along a highway not as far as practicable from the edge of the highway, and one for parking a vehicle in a no-parking zone. (Doc. 59, ¶ 14; Doc. 59-11, at 2–3.)

Cvetko returned to the same part of Hershey Park Drive on Saturday, July 7, 2007. (Doc. 59, ¶ 24.) This time he brought his friend Danielle Norcross; she and Cvetko parked their vehicles on Hershey Park Drive and displayed signs on the vehicles. (*Id.* ¶ 49.) They remained in that spot for about twenty to twenty-five minutes before Sergeant Grubb arrived at the scene. (*Id.* ¶ 27.) Grubb informed Cvetko and Norcross that their vehicles were parked in a no-parking zone. (*Id.* ¶ 66.) During a conversation between Grubb and Norcross, Cvetko picked up one of his signs and walked across the roadway to the median of Herskey Park Drive. (*Id.* ¶ 68.) Sergeant Grubb approached Cvetko, escorted him off the median, and took him into custody.[1] (*Id.* ¶ 28.) Grubb testified that

_____

[1]Cvetko testified at some length about the manner in which Grubb effected the arrest, and devoted a significant amount of space to the matter in both his brief opposing summary judgment and his statement of contested facts. Cvetko testified that Grubb put him in a "very, very painful" hold and "stuff[ed]" him into the police vehicle, causing an injury that would later be diagnosed at the hospital as a sprained wrist. (Doc. 49-2, at 101:11–103:6, 105:22–106:7.) However, even if this testimony could have supported a cause of action based on the alleged use of excessive force, it is irrelevant to all of the claims in Cvetko's complaint. Whether Grubb's alleged use of force was excessive in the situation is irrelevant to Cvetko's claims under the First Amendment, the Fourteenth Amendment, and the Pennsylvania Constitution, as well as his conspiracy claim under 42 U.S.C.

he asked Cvetko to leave the median and that Cvetko refused his two requests to do so, although Cvetko states that Grubb simply arrested him wordlessly. (*Id.* ¶¶ 69–70; Doc. 64, ¶¶ 69-70.) The next day, Grubb filed a Police Criminal Complaint charging Cvetko with three crimes: disorderly conduct under 18 Pa. Cons. Stat. Ann. § 5503(a)(4); failure to walk on the shoulder as far as possible from the highway when upon a highway without a sidewalk under 75 Pa. Cons. Stat. Ann. § 3544(b); and failure to comply with instructions of a police officer authorized to direct, control, or regulate traffic under *id.* § 3541(a).

### *(B) Procedural history*

This case commenced with Cvetko's filing of his complaint (Doc. 1) on July 1, 2009. After Hershey Entertainment & Resorts and Robert Meals[2] (collectively HE&R) filed a motion to dismiss (Doc. 3) on July 21, Cvetko filed an amended complaint (Doc. 5) on August 7. HE&R again filed a motion to dismiss (Doc. 10) on August 26, and after Cvetko obtained leave of the Court to file a second amended complaint (Doc. 15), he did so (Doc. 16) on September 8. HE&R filed a third motion to dismiss (Doc. 17) on September 18. Before HE&R filed a brief in support, Cvetko filed a brief in opposition (Doc. 19) on September 24. Four days later, on September 28, HE&R filed their supporting brief (Doc. 22). Cvetko refiled his brief in opposition on October 15 (Doc. 27), to which HE&R responded with a reply brief (Doc. 28) on October 26. The Court granted HE&R's motion to dismiss the claims against them on May 4, 2010 (Doc. 39) while allowing Cvetko to file a motion for leave to amend, which he did file on June 17 (Doc. 47), although this motion was denied on July 20, 2010 (Doc. 52).

§ 1985(3). Accordingly, the Court notes this immaterial factual dispute only in passing.

[2]HE&R and Meals are no longer parties to this case.

Meanwhile, defendants Derry Township Police Department and the four police officers answered the amended complaint on October 26, 2009 (Doc. 29). Cvetko's motion to replace the "John Doe" named in his complaint with Patrick Rudisil was granted on March 9, 2010 (Docs. 35, 36). After completion of discovery, defendants filed their motion for summary judgment (Doc. 58) on August 20, 2010, properly accompanied by a statement of facts (Doc. 59) and brief in support (Doc. 60). Cvetko filed a brief in opposition (Doc. 63) on September 9 and an answer to defendants' statement of facts (Doc. 64) on September 11. Defendants have not filed a reply brief.

## II. Standard of Review

Federal Rule of Civil Procedure 56(c) requires the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1287–88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable inferences in favor of the nonmoving party. *Moore v.*

5

*Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988). In order to avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. When the party seeking summary judgment satisfies its burden under Rule 56(c) of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party is required by Rule 56(e) to go beyond the pleadings with affidavits, depositions, answers to interrogatories, or the like in order to demonstrate specific material facts that give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). When Rule 56(e) shifts the burden of production to the nonmoving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial, for "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323; *see Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

## III. Discussion

Cvetko's complaint contains three counts. Count I, under 42 U.S.C. § 1983, alleges that defendants unlawfully retaliated against him for exercising his First Amendment rights by arresting him on the median of Hershey Park Drive during his protest. Count II alleges equal protection violations both under § 1983 and § 1985(3), claiming that he was a member of a class protected by the Equal Protection Clause of the Fourteenth Amendment to the Constitution and that he was a victim of a conspiracy to deprive him of his rights. Count III restates the Equal Protection claim under the Constitution of Pennsylvania rather than the federal Constitution. Each claim will be addressed in turn,

although the analysis first addresses matters regarding which parties are amenable to suit and in what capacity.

### *(A) Merger of claims against municipal officers sued in their official capacities with claims against the municipality*

When a public servant is sued "in his official capacity," a judgment against him "imposes liability on the entity that he represents provided . . . [that] the public entity received notice and an opportunity to respond." *Brandon v. Holt*, 469 U.S. 464, 471–72 (1985). An official-capacity suit is "only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978). Accordingly, a suit against a police officer is no different from a suit against the police agency itself. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70–71 (1989) (citing *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985); *Monell*, 436 U.S. 690 n.55) (explaining that a suit against a state official is equivalent to a suit against the State itself); *id.* at 71 (holding that officials acting in their official capacities are not "persons" under § 1983).

Cvetko's complaint did not specify whether the defendant officers Grubb, Henry, Harrer, and Rudisil were being sued in their individual capacities, official capacities, or both. To the extent that these four defendants were sued in their official capacities, the claims against them merge with the claims again the Derry Township Police Department; it is therefore recommended that any claims intended to be made against the officers in their official capacity be dismissed.

### *(B) Qualified immunity for officers sued in their individual capacity*

The defendant officers have asserted the affirmative defense of qualified immunity, which is "an *immunity from suit* rather than a mere defense to liability; and like

an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The risk of losing this entitlement indicates the importance of resolving questions of qualified immunity as early as possible in the litigation.

Because the purpose of the qualified-immunity doctrine is to "ensure that insubstantial claims against government officials be resolved prior to discovery," defendants would have been best advised to argue their qualified-immunity defense in connection with a motion to dismiss under Federal Rule of Procedure 12(b)(6), rather than waiting until the summary-judgment stage. *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987)) (internal quotation marks omitted). Although this case has been working its way through the court system for fourteen months now and the qualified-immunity question could have been answered a year ago, it may still be answered now with the benefit of the record.

There are two inquiries that a court must make in determining whether a defendant is entitled to qualified immunity. One is whether the facts as alleged in the complaint make out a violation of a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The second question is whether "the right was clearly established . . . in light of the specific context of the case." *Id.* Although the Supreme Court had until recently required that these two questions be addressed strictly in the order presented, this requirement has been relaxed, and lower courts may now "exercise their sound discretion in deciding which of the two prongs of the qualified-immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S. Ct. at 815–17. Given that discovery has been completed in this case, the qualified-immunity analysis will examine not the complaint but the record.

Qualified immunity serves as a shield from suit if a defendant official could have reasonably believed that the actions in question were lawful in light of clearly established

law and the information the defendant possessed at the time. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Anderson*, 483 U.S. at 641). Officials who "reasonably but mistakenly" conclude  that their actions were lawful are still entitled to immunity. *Id.* This standard "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Id.* at 229 (citing *Malley v. Briggs*, 475 U.S. 335, 343 (1986)).

(1) Public-forum analysis

Turning to the facts of the case before the Court, plaintiff has failed to establish that at the time of his arrest, he had any "clearly established" constitutional right that was being violated. The undisputed evidence shows that on two occasions prior to his arrest on July 7, he had been warned against protesting on the median (June 23), then cited for being on the median (July 2) and reminded that he could protest from the shoulder of the road.

Longstanding precedent establishes that even a traditional public forum like a street may be subject to reasonable "time, place, and manner" restrictions so long as the restrictions (1) are "justified without reference to the content of the regulated speech," (2) are narrowly tailored to serve a significant government interest, and (3) allow for alternate means of communication. *Ward v. Rock Against Racism*, 491 U.S. 781, 792 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)); *Startzell v. City of Philadelphia*, 533 F.3d 183, 198 (3d Cir. 2008) (quoting *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 130 (1992)). As the Supreme Court has made clear, "[e]ven protected speech is not equally permissible in all places and at all times." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799–800 (1985) (citing *Jones v. N.C. Prisoners' Labor Union*, 433 U.S. 119, 136 (1977)).

The "principal inquiry" in time, place, and manner cases is "whether the government has adopted a regulation of speech because of disagreement with the message it conveys."

*Ward*, 491 U.S. at 792. The regulation in question—the state-law requirement that a pedestrian on a road without sidewalks stay on the shoulder, as far from the highway as possible—has a ready justification of public safety and makes no reference to the content of speech by those pedestrians who might be on highway medians. 75 Pa. Cons. Stat. Ann. § 3544(b). As for whether the law is narrowly tailored, it would strain the imagination to try to envision a simpler way to avoid having pedestrians milling about the highways than to mandate that they stay on the shoulders. If law-enforcement officers were unable to require pedestrians to keep off of roadways and roadway medians without worrying about the threat of a lawsuit in federal court, police officers' ability to ensure the safety of both pedestrians and motorists could be seriously undermined. Finally, as the defendant officers told plaintiff, and as plaintiff knew, he was free to conduct his protest from the shoulder of the highway, which shows that there were ample alternative methods of communication.

Because plaintiff's conduct was subject to reasonable time, place, and manner restrictions, he had no clearly established First Amendment right in the context of this case.


(2) Equal Protection and a "class of one"

Because plaintiff is not a member of any protected class, proving his case would require that he show that he is a valid "class of one," by which he must prove that (1) the officers treated him differently from others similarly situated; (2) the officers did so intentionally; and (3) there was no rational basis for the difference in treatment. *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006). Because the qualified-immunity standard operates based on the information that defendants had at the time, plaintiff would have to show that defendants knew of others who had repeatedly violated § 3544(b) but who had not been arrested for so doing. Plaintiff has not made this showing. Although he has introduced evidence of police reports in which neither citations were issued nor arrests made of persons soliciting in roadways or protesting from the street, none of them involved

repeat encounters with the same offenders, and just as important, none of these reports involved any of the officers who are defendants in this case.[3] In short, plaintiff has

---

[3] The police reports that plaintiff submitted can be summarized as follows. Report of 10/27/2002: Officer Relchard describes an incident involving protesters on the grounds of the Free Church. (Doc. 63-4, at 36–39.) Report of 12/7/2002: Officer Shank told two solicitors at the intersection of West Chocolate Avenue and Hockersville Road that they had to leave the intersection for safety reasons and that they might want to receive permission from businesses to solicit on their lot. (*Id.* at 40–43.) Report of 11/12/2005: Officer Bernardo advised four solicitors in the 1400 block of West Hershey Park Drive that they were not permitted to be on roadways; if they returned, they could be cited. (*Id.* at 44–47.) Police report of 11/13/2005: Officer Pavone told Penn State students soliciting donations in the 1400 block of West Hershey Park Drive that they need to stay on the median at all times unless a driver has a donation. (*Id.* at 3–5.) Report of 11/4/2006: Officer Dotts tells "individuals" at the intersection of West Chocolate Avenue and Cocoa Avenue that they cannot step out into traffic to collect money. (*Id.* at 51–52.) Report of 7/25/2006: Officer Henise tells four solicitors at the intersection of Hershey Park Drive and Walton Avenue that they need a permit for soliciting and must stay on the berm. (*Id.* at 54–58.) Report of 2/16/2008: Officer Eckenrode confronts two protesters "on the northwest corner behind the guide rail" at Hershey Park Drive and Mae Street. (*Id.* at 59–64.) Report of 8/4/2008: Officer Bennett tells solicitors at the intersection of Hershey Park Drive and Mae Street that they need a permit; the leader agreed to stop. (*Id.* at 65–67.) Report of 9/12/2009: Officer Henry told solicitors at Fishburn Road and West Governor Road that they are not allowed onto the roadway to collect money. (*Id.* at 68–70.) Report of 9/24/2009: Officer Sargen told solicitors at Hershey Park Drive and Mae Street that they need a permit for solicitation; before leaving, the leader noted that when he was there the previous year, he was not made aware that they needed a permit. (*Id.* at 71–75.) Report of 10/13/2009: Officer Keister told protesters that their car, parked at the "south berm of Hershey Park Drive, just east of Old West Chocolate Avenue," was in a no-parking zone, and advised them to move the car to an area where there is no parking restriction. (*Id.* at 76–78.) None of these reports address repeat violators of § 3544(b). Five of them post-date plaintiff's arrest by as much as five years. The only report that remotely supports plaintiff's case is the report of November 13, 2005, in which Officer Pavone told students that they must stay on the median. (Doc. 34-6, at 3–5.) However, this isolated report is

introduced neither evidence of others similarly situated but differently treated generally nor evidence specifically of defendants' knowledge of any such dissimilar treatment.

### (4) Conclusion

Because plaintiff had no clearly established federal constitutional rights that were being violated by the defendant officers in this case, the officers are entitled to qualified immunity, and it is therefore recommended that the federal constitutional claims against them be dismissed.

### *(B) Claims against defendants Harrer and Rudisil*

Defendant officers Harrer and Rudisil also argue that the claims against them should be dismissed because they were uninvolved in plaintiff's arrest or the actions that allegedly violated plaintiff's rights. They note that there is no evidence in the record to connect them with any of plaintiff's claims. Plaintiff's argument in support of his claims against these defendants consists essentially of the following:

> Cvetko was injured by Officer Harrer's behavior in continuing the discriminatory actions against Cvetko, although Cvetko did not directly interact with Harrer. . . . Community Service Officer Harrer responded to the area and stood by until the vehicles were removed.
> . . . [Cvetko] interacted with Community Service Officer Rudisil on an unknown date when Cvetko saw Rudisil observing people fundraising from the medians but doing nothing to stop their behavior.[4]

(Doc. 63, at 14–15 (internal quotation marks omitted).) This frivolous argument seems to suggest that an officer within plaintiff's visual range during the time frame relevant to the

---

inadequate to establish plaintiff's case.

[4]Nothing in any portion of plaintiff's cited testimony established that Rudisil actually made any such observations.

complaint is sufficient to impose some kind of liability on the officer. Plaintiff argues that despite a lack of interaction with Harrer, and despite having no more interaction with Rudisil than what was apparently plaintiff telling Rudisil about a "problem" he had (Doc. 49-2, at 211), these two officers somehow violated plaintiff's constitutional rights. If Harrer and Rudisil's "involvement" were sufficient for plaintiff to be able to maintain claims against them on the facts in this case, plaintiff could just as well have claimed against any other officer that he spoke to, that stopped by the scene to offer assistance, or who otherwise suggested to plaintiff that he might be violating state law by standing on the median. Plaintiff's creatively futile, sprawling theory of liability cannot succeed.

It is therefore recommended that the claims against Harrer and Rudisil be dismissed alternatively based on their noninvolvement with the events at issue.

### (C) Section 1983, the First Amendment, and retaliation

Section 1983 creates no substantive rights, but rather provides a remedy for infringement of rights established by other federal laws. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002) ("[Section] 1983 merely provides a mechanism for enforcing individual rights 'secured' elsewhere . . . ."). The statute provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C.A. § 1983 (West 2010). Recovery under § 1983 requires proving that "a person acting under color of state law" deprived the plaintiff of a "right secured by the Constitution and the laws of the United States." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996) (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995)).

13

Plaintiff argues that his First Amendment rights were violated when defendants, by arresting him, retaliated against him for engaging in constitutionally protected speech. His constitutional retaliation claim is subject to a three-part test, which requires him to prove "(1) that he engaged in constitutionally protected activity; (2) that the government responded with retaliation; and (3) that the protected activity caused the retaliation." *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 282 (3d Cir. 2004) (citing *Anderson v. Davila*, 125 F.3d 148, 161 (3d Cir. 1997)).

As discussed in Part III. B.1 above, plaintiff was not engaged in constitutionally protected activity. Although streets are traditional public fora and political protest is one of the fundamental protected forms of speech, plaintiff had failed to observe the applicable time, place, and manner restrictions while making his protest. There is no evidence to suggest that defendants were retaliating against plaintiff when they arrested him; plaintiff had been given repeated warnings on previous occasions, and was specifically cautioned that if he returned to the median to protest on July 7, he would be arrested, which he then was. He had been told that there would be no problem with him continuing his protests from the shoulder of the highway; and, significantly, plaintiff had in fact protested from the shoulder between April and late July without any interference from law-enforcement officials. There is every indication in this case that plaintiff was arrested not for his speech but rather for violating Pennsylvania state law, most notably § 3344(b), which prohibited him from being on the median. Since plaintiff's protected activity could not have caused defendant's retaliation if plaintiff's activity was not protected and defendants did not retaliate, plaintiff has failed to establish any of the three elements of a retaliation claim.

(1) Probable cause

Defendants also argue that a retaliatory-prosecution claim is defeated by the existence of probable cause. This argument has support in the case law. *See Hartman v.*

14

*Moore*, 547 U.S. 250, 251–52 (2006) (holding, in a *Bivens* action "against criminal investigators for inducing prosecution in retaliation for speech," that plaintiff needed to allege and prove a lack of probable cause); *McKenna v. Schauer*, No. 08-0682, 2009 WL 959869, *4 (M.D. Pa. Apr. 6, 2009) (quoting *Gallis v. Borough of Dickson City,* No. 05-551, 2006 WL 2850633 (M.D. Pa. Oct. 3, 2006); citing, *e.g.*, *Dahl v. Holley*, 312 F.3d 1228, 1236 (11th Cir. 2002)) (noting that although the Third Circuit has not passed upon the issue, numerous courts have determined that the existence of probable cause "prohibits a plaintiff from prosecuting a First Amendment retaliation claim"); *Lacey v. Borough of Darby*, 618 F. Supp. 331, 335 (E.D. Pa. 1985) ("An official who reasonably determines that the plaintiff violated a statute has probable cause to arrest, and an arrest based on probable cause is not unlawful even if plaintiff was incidentally exercising First Amendment rights." (citing *Losch v. Borough of Parksesburg*, 736 F.2d 903, 907–09 (3d Cir. 1984))).

"Probable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested." *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002) (citing *Beck v. Ohio*, 379 U.S. 89, 89 (1964)). The constitutional validity of the arrest turns on "the facts available to the officers at the moment of arrest." *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994) (quoting *Beck*, 379 U.S. at 96) (internal quotation marks omitted). The validity of the arrest itself, on which the constitutional probable-cause analysis is based, is a matter of state law. *Myers*, 308 F.3d at 255 (citing *Ker v. California*, 374 U.S. 23, 37 (1963)). The arresting officers need only "some reasonable basis" to believe that the person being arrested has committed a crime. *Barna*, 42 F.3d at 809.

The evidence is disputed as to whether plaintiff failed to comply with an order of a police officer (which would have been a violation of 75 Pa. Cons. Stat. Ann. § 3541(a)), but there is no dispute over evidence that provided defendants with "some reasonable basis" to

arrest plaintiff for disorderly conduct under § 5503(a)(4) and failure to stay on the shoulder of the road under § 3544(b).

Under 18 Pa. Cons. Stat. Ann § 5503(a)(4), a person is guilty of disorderly conduct "if, with intent to cause public inconvenience, annoyance, or alarm, or recklessly creating a risk thereof," he "creates a hazardous . . . condition by any act which serves no legitimate purpose of the actor." In this case, plaintiff admitted that while his friend Norcross was talking with Officer Grubb, he crossed from the shoulder to the median of Hershey Park Drive and remained there. Sergeant Grubb could have reasonably believed that plaintiff was thereby recklessly creating a risk of "public inconvenience, annoyance, or alarm" by crossing a busy roadway outside of a pedestrian crossing and by occupying a portion of the roadway where pedestrians normally are not found. Plaintiff's same actions supported a reasonable belief that there was no legitimate purpose for plaintiff to have crossed the street to the median; if plaintiff's ostensible purpose was protesting, he knew that he could have permissibly carried out his protest from the shoulder.

The text of 75 Pa. Cons. Stat. Ann. § 3544(b) states: "Where a sidewalk is not available, any pedestrian walking along and upon a highway shall walk only on a shoulder as far as practicable from the edge of a roadway." Because Sergeant Grubb observed plaintiff cross the roadway from the shoulder to the median, there were adequate facts within Grubb's knowledge to support a reasonable belief that plaintiff was in violation of § 3544(b).

Because Sergeant Grubb had probable cause to arrest plaintiff, plaintiff's retaliation claim fails on this ground as well.

*(D) Equal Protection and a "class of one"*

As discussed in Part III.B.2 above, plaintiff has failed to establish that any of the defendant officers were even aware of other individuals situated similarly to plaintiff, which precludes any chance that plaintiff might succeed in making an argument that he was treated unequally. However, this line of reasoning does not apply to the Derry Township Police Department, although plaintiff's burden in a case against the Department is different.[5]

*(1) Municipal "custom or policy"*

A municipality cannot be held liable for the acts of its agents or employees under § 1983 based on a respondeat superior theory. *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 691 (1978). To support liability under § 1983, a plaintiff must prove that the injuries alleged in the complaint were the result of a municipal "policy or custom." *Id.* at 694. Although the Court appeared to collapse this "two-track path to municipal liability" in a 1986 decision, subsequent Supreme Court jurisprudence has shown that either a "policy" or a "custom" may render a municipality subject to suit under § 1983. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (holding that § 1983 liability attaches "where—and only where—a deliberate choice to follow a course of action is made" from several choices by the policy-maker with final decision-making power); *City of Canton v. Harris*, 489 U.S. 378, 389 (1989) (making use of the "policy or custom" language).

Plaintiff has not argued that his rights were violated subject to a municipal policy; he argues only for the existence of a municipal custom.

---

[5]The term "municipality" is used in context to be synonymous with "municipal entity."

17

(a) Liability for municipal custom

Municipal "custom" can be established in a number of different ways. A course of conduct can be considered a custom "when, though not authorized by law, 'such practices of state officials [are] so permanent and well-settled' as to virtually constitute law." *Beck v. City of Pittsburg*, 89 F.3d 966, 971 (3d Cir. 1996) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)) (alteration in original). Custom may alternatively be established by showing that "a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants." *Harris*, 489 U.S. at 389.

In his brief opposing summary judgment, plaintiff makes his case for the existence of a municipal custom thus:

> Derry Township [has] a custom of affording people who are not protesting HE&R or other Hershey companies numerous opportunities to comply with the law, while citing and arresting those persons who do [protest Hershey companies]. Cvetko had been told by Penn State students that a Derry Township Officer ordered them to remain only on the median whenever soliciting funds from traffic.

(Doc. 63, at 17.) Plaintiff's argument and evidence both fail to establish any such "permanent and well-settled" custom.

First, whatever Penn State students told plaintiff about what they had been told by a police officer is double hearsay: plaintiff testified to Penn State students' out-of-court statements, which, in turn, were about the out-of-court statements of a police officer. The only possible use of this testimony is for the truth of the statements, which puts it squarely within the prohibitions of the Federal Rules of Evidence. Fed. R. Evid. 801(c), 802. Plaintiff did submit a police report dated November 13, 2005 that appears to corroborate the Penn State students' story, in that the narrative section of the report states that Officer Pavone instructed some students "to stay on the median at all times unless someone in stopped traffic motions to them that they have a donation." (Doc. 63-4, at 5.) However, Officer

Pavone had spoken to a young woman associated with the sorority Alpha Epsilon Delta; plaintiff had gotten his information from a group of young men, indicating that this police report describes a different event from the one during which plaintiff's interlocutors got their information.

Second, the police reports that plaintiff submitted simply do not support his argument. The lone report that appears consistent with his claim is the one just discussed, wherein Officer Pavone spoke to the Alpha Epsilon Delta students. None of the other reports show that officers allowed anyone on medians or in the roadway. Notably, a police report from the previous day—November 12, 2005—involves an officer who told solicitors that they were not permitted to be in the roadway. (Doc. 63-4, at 44–47.) Of those reports describing incidents with some factual relevance, none involved repeat offenders that had been given "numerous opportunities to comply with the law"; all of them described one-time offenders who ceased their activity.[6] There is no evidence that any of these offenders returned and were merely warned again. The solitary occurrence of November 13, 2005, which contrasts with the rest of the police reports, is not enough to show a "permanent and well-settled" practice of state officials that "virtually constitute[s] law."

Finally, plaintiff's testimony that he had seen solicitors and fundraisers standing on medians and entering roadways does not establish that these groups were treated preferentially while being situated similarly to plaintiff. The mere fact that these groups were violating § 3544 (b) but not cited or arrested for it does not establish discriminatory treatment of plaintiff without additional evidence showing that (a) these groups were the subject of police attention, e.g., were actually observed by officers, and (b) these groups received mere warnings on multiple occasions but were not cited or arrested. Law-enforcement officers are, of course, unable to be in all places at all times, and thus there is a

_____

[6]In fact, in this entire case, the only evidence of anyone given numerous opportunities to comply is plaintiff himself; he chose to ignore them.

great deal of activity that escapes their notice. If plaintiff could successfully claim disparate treatment solely because others had gotten away with the statutory violation that he was caught committing, then likewise could anyone accused of a crime claim an Equal Protection violation because there were other similar crimes that had gone undetected. Plaintiff has come forward with no evidence that would show that these other groups standing on medians were ever so much as observed by the police.

### (2) Conclusion

Because plaintiff has failed to establish either that he is a "class of one" or that he is a member of some other protected class, it is recommended that his Equal Protection claim under the Fourteenth Amendment be dismissed.

### (E) Conspiracy under § 1985(3)

Section 1985(3) prohibits conspiracies to deprive "any person or class of persons of the equal protection of the laws, or equal privileges and immunities under the laws." 42 U.S.C.A. § 1985(3) (West 2010). Plaintiff's § 1985(3) claim against HE&R was dismissed by order of the Court on May 4, 2010 (Doc. 39), leaving only the Derry Township Police Department and its officers as defendants in this case. The surviving § 1985(3) claim can be dismissed on either of two grounds. First, the Court's analysis in its order of May 4, 2010, is equally applicable here, and the § 1985(3) claim should be dismissed based on the same reasoning. Second, under the intracorporate conspiracy doctrine, a § 1985(3) conspiracy between an municipal entity and its agents can only be maintained to the extent that liability is asserted against the agents in their individual capacities. *Tomino v. City of Bethlehem,* No. 08-6018, 2010 WL 1348536, at *16 (E.D. Pa. March 31, 2010) (citing *Scott v. Township of Bristol*, No. 90-1412, 1990 WL 178556, at *6 (E.D. Pa. Nov. 14, 1990)). *See also Scott*, 1990 WL 178556, at *7 (collecting cases in which the intracorporate conspiracy

doctrine has been extended to § 1985(3) claims). Since the defendant officers are entitled to qualified immunity for claims against them in their individual capacities, the intracorporate conspiracy doctrine operates to block plaintiff's § 1985(3) claim entirely.

It is therefore recommended that plaintiff's § 1985(3) claim be dismissed.

### (F) Claims under the Pennsylvania Constitution

Because Pennsylvania Constitution's Equal Protection clause provides protection coextensive with the federal counterpart, the above analysis applies equally to plaintiff's claims under the Pennsylvania Constitution. *See Erfer v. Commonwealth*, 794 A.2d 325, 332 (Pa. 2002) (describing the Pennsylvania Constitution as not providing protection greater than the federal Equal Protection Clause.)

### (G) Punitive damages

Given the foregoing recommendations for dismissal of all of plaintiff's remaining claims, it is recommended that his request for punitive damages be dismissed as well.

## IV. Conclusion

Based on the foregoing discussion, it is recommended that defendant's motion for summary judgment be GRANTED in full, and that plaintiff's complaint be DISMISSED.

<div style="margin-left:40%">
s/ William T. Prince<br>
William T. Prince<br>
United States Magistrate Judge
</div>

September 16, 2010